IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION
5:20-CT-03150-D

| | |
|---|---|
| STEVEN DIXON PRENTICE,<br><br>    Plaintiff,<br><br>v.<br><br>STATE OF NORTH CAROLINA, *et al.*,<br><br>    Defendants. | **MEMORANDUM IN SUPPORT OF CLIFFORD CURTIS, M.D.'S MOTION FOR SUMMARY JUDGMENT** |

NOW COMES Defendant Clifford Curtis, M.D. (hereinafter, "Defendant Curtis" or "Dr. Curtis"), by and through counsel, pursuant to Rule 56 of the Federal Rules of Civil Procedure, and respectfully submits this Memorandum in Support of his Motion for Summary Judgment "(Motion") and requests that the Court grant his Motion and enter judgment in his favor on the following grounds: (1) Defendant Curtis was not deliberately indifferent to Plaintiff's serious medical need, if any, and (2) Defendant Curtis is entitled to qualified immunity.

## NATURE OF THE CASE

Steven D. Prentice ("Plaintiff"), a convicted and sentenced prisoner in the custody of the North Carolina Department of Public Safety - Division of Adult Correction ("NCDPS"), is attempting to allege a § 1983 action for deliberate indifference to a serious medical need by Dr. Curtis while he was incarcerated at Warren Correctional Institution ("Warren") (DE 1 at 6). Dr. Curtis provided medical care to Plaintiff that is at issue in this case only at Warren. Affidavit of Clifford Curtis, M.D. ("Curtis Aff.") ¶ 4.

## PROCEDURAL HISTORY

Pursuant to 42 USC § 1983, Plaintiff filed a *pro se* Complaint (DE 1, at 6-9), Supporting Memorandum in Support of Complaint (DE 1-1), and Affidavits of Fact (DE 3 and 4) on April 23,

1

2020, alleging Eighth Amendment and Fourteenth Amendment violations (among others) against "Dr. Wayne Curtis" in his individual and official capacities. On May 7, 2020, Plaintiff filed a Supplemental Pleading (DE 10) and on September 17, 2017, Plaintiff filed a Request for Second Supplemental Pleading (DE 14) and a List of Exhibits (DE 17). On February 16, 2021, this Court concluded its frivolity review, allowing *inter alia* Plaintiff's Eighth Amendment claims concerning his medical care as to "Dr. Wayne Curtis". (DE 18). All other claims as to Defendant Curtis, including any claims under the ADA and Rehabilitation Act, were dismissed. *Id*. On February 16, 2021, the Court issued a Notice of a Lawsuit and Request to Waive Service of a Summons ("Notice") to Dr. Wayne Curtis. (DE 19, p. 2). Defendant Curtis's Waiver was deemed timely filed on May 13, 2021 (DE 34, 37).

In his Complaint and supplemental pleadings as to Defendant Curtis, Plaintiff alleges that Defendant Curtis treated him only at Warren. (DE 1 at 6). Regarding the § 1983 complaints as to Defendant Curtis during the applicable time period, Plaintiff alleges that while at Warren, he underwent diagnostic tests that revealed blood in his stool, the results of which were provided to him on August 2, 2018, and he was notified that a colonoscopy had been scheduled. (DE 17-2 at 105). Plaintiff submitted medical documentation to the Court demonstrating that on or about September 25, 2018 while at Warren, he underwent an endoscopy and colonoscopy to examine his esophagus, stomach and intestines. (DE 17-1 at 192-193, DE 17-2 at 106). On September 28, 2018, Plaintiff requested the results of the colonoscopy. *Id*. Plaintiff further alleges that Defendant Curtis indicated that Plaintiff's purported Crohn's, irritable bowel syndrome (IBS), and ulcerative colitis symptoms were psychosomatic and referred Plaintiff to a mental health expert, a psychologist, and that Defendant Curtis prescribed Plaintiff an antidepressant. (DE 1 at 8, DE 1-1 at 24). Plaintiff alleges that he was seen by Defendant Curtis on December 21, 2018, and

Defendant Curtis prescribed Elavil for him, which he refused on January 11, 2019, and which was discontinued per his refusal on January 31, 2019. (DE 17-2 at 106-107). Plaintiff also asserts that while in NCDPS custody, he was prescribed extra toilet paper and different diets for his condition, which he refused. (DE 3 at 4, DE 17-1 at 142).

On July 12, 2021, Dr. Curtis filed his Motion to Dismiss, Memorandum in Support, and Answer. (DE 63, 64 and 65). Plaintiff failed to respond to Dr. Curtis's Motion to Dismiss. On November 18, 2021, this Court granted Dr. Curtis's Motion to Dismiss as to the section 1983 claims against Dr. Curtis in his official capacity only. (DE 94). On February 17, 2202, the Court entered an order establishing a deadline of July 7, 2022 for the filing of motions. (DE 117). Dr. Curtis now moves for summary judgement in his favor as to the remaining section 1983 claim.

## LEGAL ARGUMENT

### I. STANDARD APPLICABLE TO MOTION FOR SUMMARY JUDGMENT

Summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The moving party seeking summary judgment bears the initial burden of demonstrating the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325, 106 S. Ct. 2548, 2554 (1986). Once the moving party has met this burden, the non-moving party cannot rest on bare pleadings alone, but "must come forward with specific facts showing that there is a genuine issue for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S. Ct. 1348, 1356 (1986) (quotation omitted & emphasis removed).

A district court should grant summary judgment unless a reasonable jury could return a verdict for the non-moving party on the evidence presented. *Anderson v. Liberty Lobby, Inc.*, 477

U.S. 242, 249, 106 S. Ct. 2505, 2511 (1986). An otherwise properly supported motion for summary judgment will not be defeated by the existence of any factual dispute; only disputes over facts that might affect the outcome of the suit under governing law will properly preclude summary judgment. *Id.* at 248-49, 106 S. Ct. at 2510-11. "Conclusory or speculative allegations do not suffice, nor does a mere scintilla of evidence in support of" the nonmoving party's case. *Thompson v. Potomac Elec. Power Co.*, 312 F.3d 645, 649 (4th Cir. 2002) (int. quot. omitted). Thus, a nonmoving party who relies on mere belief or conjecture, or the allegations and denials contained in his pleadings, cannot avoid summary judgment. *Bouchat v. Baltimore Ravens Football Club, Inc.*, 346 F.3d 514, 522 (4th Cir. 2003), *cert. denied*, 541 U.S. 1042, 124 S. Ct. 2171 (2004).

Moreover, in the context of prisoner litigation involving claims of deliberate indifference to a serious medical need, district courts are entitled to rely on medical affidavits and prison medical records concerning the examination and treatment of the inmate at the summary judgment stage. *Bennett v. Reed*, 534 F. Supp. 83, 86-87 (E.D.N.C. 1981) (district court may rely on affidavits of medical personnel and medical records at summary judgment stage notwithstanding inmate's contrary assertions), *aff'd*, 676 F.2d 690 (4th Cir. 1982) (mem.); *Swain v. Garribant*, 354 F. Supp. 631, 633-34 (E.D.N.C. 1973). "In short, if it appears from the record that the prison medical authorities have made a sincere and reasonable effort to handle the prisoner's medical problems, the constitutional requirements have been met." *Stokes v. Hurdle*, 393 F. Supp. 757, 763 (D. Md. 1975), *aff'd*, 535 F.2d 1250 (4th Cir. 1976); *see also, Dulany v. Carnahan*, 132 F.3d 1234, 1240 (8th Cir. 1997) ("In the face of medical records indicating that treatment was provided and physician affidavits indicating the care provided was adequate, an inmate cannot create a question of fact by merely stating that she did not feel she received adequate treatment.").

## II. DR. CURTIS IS ENTITLED TO JUDGMENT AS A MATTER OF LAW BECAUSE HE WAS NOT DELIBERATELY INDIFFERENT TO A SERIOUS MEDICAL NEED

Plaintiff cannot establish that Dr. Curtis was deliberately indifferent to a serious medical need where Dr. Curtis examined Plaintiff when he presented to Dr. Curtis for treatment, evaluated Plaintiff's medical chart when it was referred and provided to Dr. Curtis for review, Dr. Curtis renewed medication, ordered appropriate laboratory work, and prescribed appropriate treatment including referrals to other specialists, Dr. Curtis exercised his medical judgment based on his training and experience to address Plaintiff's medical condition, and Dr. Curtis did not knowingly violate any of Plaintiff's constitutional rights or knowingly deprive Plaintiff of any necessary medical care. Curtis Aff. ¶ 32.

Between the dates of June 7, 2018 and February 5, 2019, Dr. Curtis personally examined inmate Prentice on at least one (1) occasion and performed chart reviews of his medical record and/or test results on at least eight (8) occasions. Additionally, Dr. Curtis ordered referrals and UR Requests for consultants and/or diagnostic studies and therapeutic diets when necessary and renewed inmate Prentice's medications on more than one occasion. Inmate Prentice was seen by various other health care providers, including nurses, a dietician and a gastroenterologist. Dr. Curtis treated Plaintiff's medical condition appropriately based on his medical training and judgment and made professional medical decisions to address Plaintiff's subjective complaints and Dr. Curtis's objective findings. Curtis Aff. ¶ 32. Further, Dr. Curtis's referral decisions and decisions to submit UR Requests for diagnostic studies and/or consultations were based on his medical judgment as to the appropriate care for Plaintiff. At no time did Dr. Curtis disregard the symptoms Plaintiff reported to him, but to the contrary, Dr. Curtis took appropriate action and

made professional decisions and treatment plans pertaining to Plaintiff based on Dr. Curtis's medical judgment. Curtis Aff. ¶ 32.

### A. Requirements for a § 1983 action

In the context of medical care, the United States Supreme Court defined "cruel and unusual punishment" as "deliberate indifference to serious medical needs[.]" *Estelle v. Gamble,* 429 U.S. 97, 104, 97 S. Ct. 285, 291 (1976). "Deliberate indifference is a very high standard," *Grayson v. Peed,* 195 F.3d 692, 695 (4th Cir. 1999), and the Supreme Court made it clear in *Estelle* that neither negligence nor medical malpractice will state a cognizable claim. *Estelle*, 429 U.S. at 107. "Medical malpractice does not become a constitutional violation merely because the victim is a prisoner." *Id*. at 106. Furthermore, medical decisions, such as treatment choices, are beyond the scope of the Eighth Amendment:

> [T]he question whether an X-ray or additional diagnostic techniques or forms of treatment is indicated is a classic example of a matter for medical judgment. A medical decision not to order an X-ray, or like measures, does not represent cruel and unusual punishment.

*Id*. at 107; *Graham v. Hurst*, No. 13-C-3108-F, 2015 WL 670321, at *4 (E.D.N.C. Feb. 17, 2015) ("Likewise, disagreements over medications, diagnostic techniques, forms of treatment, the need for specialists, and the timing of their intervention implicate medical judgment and not the Eighth Amendment).

"Questions of medical judgment are not subject to judicial review." *Russell v. Sheffer*, 528 F.2d 318, 319 (4th Cir. 1975) (citing *Hirons v. Director*, 351 F.2d 613 (4th Cir. 1965)); *Bowring v. Godwin,* 551 F.2d 44, 47-48 (4th Cir. 1977). Furthermore, disagreement "between an inmate and a physician over the inmate's proper medical care [does] not state a § 1983 claim unless exceptional circumstances are alleged." *Wright v. Collins*, 766 F.2d 841, 850 (4th Cir. 1985). "Significantly, an 'error in judgment' on the part of prison medical staff … will not constitute a

6

constitutional deprivation redressable under § 1983." *Wynn v. Mundo*, 367 F. Supp.2d 832, 837 (M.D.N.C. 2005), *affirmed per curiam*, 142 Fed.Appx. 193 (4th Cir. 2005) (unpublished), citing *Boyce v. Alizaduh*, 595 F.2d 948, 953 (4th Cir. 1979), *abrogated on other grounds by Neitzke v. Williams*, 490 U.S. 319, 109 S. Ct. 1827 (1989).

Furthermore, federal courts are reluctant to intervene in the daily operation of correctional institutions and "disavow any attempt to second-guess the propriety of a particular course of treatment." *Id.* The Fourth Circuit explained that such a high standard for deliberate indifference is necessary because "the Constitution is designed to deal with deprivation of rights, not errors in judgment, even though such errors may have unfortunate consequences." *Grayson v. Peed*, 195 F.3d 692, 695-96 (4th Cir. 1999); *Bowring,* 551 F.2d at 48 (explaining "along with all other aspects of health care, [a prisoner's right to psychological or psychiatric treatment] remains a question of sound professional judgment … courts will not intervene upon allegations of mere negligence, mistake or difference of opinion.").

"To establish that a health care provider's actions constitute deliberate indifference to a serious medical need, the treatment must be so grossly incompetent, inadequate, or excessive as to shock the conscience or to be intolerable to fundamental fairness." *Miltier v. Beorn*, 896 F.2d 848, 851 (4th Cir. 1990) (citation omitted), *abrogated on other grounds by Farmer v. Brennan*, 511 U.S. 825, 114 S. Ct. 1970 (1994). "[A] prison official cannot be found liable under the Eighth Amendment … unless the official knows of and disregards an excessive risk to inmate health or safety[.]" *Farmer,* 511 U.S. at 837, 114 S. Ct. at 1979 (1994). The Court of Appeals has since affirmed the two necessary elements of an Eighth Amendment claim. "In order to make out a *prima facie* case that prison conditions violate the Eighth Amendment, a plaintiff must show both (1) a serious deprivation of a basic human need; and (2) deliberate indifference to prison

conditions on the part of prison officials." *Strickler v. Waters,* 989 F.2d 1375, 1379 (4th Cir. 1993) (quotation and citation omitted); *see also Johnson v. Quinones*, 145 F.3d 164, 167 (4th Cir. 1998); *Jackson v. Lightsey*, 775 F.3d 170, 178 (4th Cir. 2014). In articulating the standard for deliberate indifference, the United States Supreme Court held:

> that a prison official cannot be found liable under the Eighth Amendment for denying humane conditions of confinement unless the official knows of and disregards an excessive risk to inmate health or safety; the official must be both aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw that inference.

*Farmer v. Brennen,* 511 U.S. at 837, 114 S. Ct. 1979.

The Fourth Circuit explained that such a high standard for deliberate indifference is necessary because "the Constitution is designed to deal with deprivation of rights, not errors in judgment, even though such errors may have unfortunate consequences." *Grayson v. Peed*, 195 F.3d 692, 695-96 (4th Cir. 1999). In *Grayson*, the Court cautioned that "[t]o lower this threshold would thrust federal courts into the daily practices of local police departments." *Id.* at 696. Similarly, to lower the threshold for deliberate indifference in the medical setting would thrust federal courts into the daily practices of prison medical facilities. Accordingly, the "allegations must reach constitutional dimension before a federal court will interfere with the internal operations of a state penal facility." *Russell v. Sheffer*, 528 F.2d 318, 319 (4th Cir. 1975) (citing *Hirons v. Director*, 351 F.2d 613 (4th Cir. 1965)).

In this case, Plaintiff's claims as to Dr. Curtis amount to nothing more than a disagreement after-the-fact as to Dr. Curtis's course of treatment and/or the timing of its intervention. Such claims are not actionable under the Eighth Amendment. *Russell,* 528 F.2d at 318-19 (4th Cir. 1965) ("Questions of medical judgment are not subject to judicial review."); *Graham v. Hurst,* No. 13-C-3108-F, 2015 WL 670321, at *4 (E.D.N.C. Feb. 17, 2015) ("Likewise, disagreements

over medications, diagnostic techniques, forms of treatment, the need for specialists, and the timing of their intervention implicate medical judgment and not the Eighth Amendment).

**B. Dr. Curtis Was Not Deliberately Indifferent and Made Appropriate Medical Judgments Regarding Plaintiff's Treatment**

Between the dates of June 7, 2018 and February 5, 2019, Dr. Curtis personally examined inmate Prentice on at least one (1) occasion and performed chart reviews of his medical record and/or test results on at least eight (8) occasions. Additionally, Dr. Curtis ordered referrals and UR Requests for diagnostic studies, including laboratory work, and therapeutic diets when necessary and renewed inmate Prentice's medications on more than one occasion. Curtis Aff. ¶ 32.

On June 19, 2018, Dr. Curtis reviewed a nurse's question pertaining to stool specimen containers. He advised the nurse to contact the lab to determine the proper container in which to store the sample to comply with lab procedures. Curtis Aff. ¶ 32.

On July 23, 2018, Dr. Curtis reviewed a nurse's referral indicating that inmate Prentice requested renewal orders for Loperamide. Dr. Curtis advised the nurse that since Loperamide was last filled three months before, pursuant to NCDPS protocol, inmate Prentice would need to be evaluated in a Sick Call Appointment as to the reason for which he previously was prescribed Loperamide. Dr. Curtis wanted to assess inmate Prentice's condition before simply renewing this medication. Inmate Prentice then asked a nurse for reconsideration of his request to renew Loperamide. On July 25, 2018, Dr. Curtis conducted another review of inmate Prentice's chart per his request. Dr. Curtis noted that inmate Prentice had a purported history of inflammatory bowel disease, ulcerative colitis, and rectal frequency. Dr. Curtis instructed nursing to determine when inmate Prentice had been last seen by a gastroenterologist for evaluation of Crohn's disease and whether there was a current gastroenterology appointment pending. Dr. Curtis additionally

entered orders for diagnostic testing, which included lab orders for C-reactive protein and ESR tests, and a complete blood count (CBC). Given inmate Prentice's complaints, purported history of inflammatory bowel disease, ulcerative colitis, and rectal frequency, and the fact that Dr. Curtis believed inmate Prentice had not had a colonoscopy within the past five years, Dr. Curtis entered an order for a coloscopy and for entry of a UR Request to approve inmate Prentice to undergo an EGD and colonoscopy. Later that day, Dr. Curtis was informed that inmate Prentice's last colonoscopy was performed on April 11, 2017. A biopsy was obtained during the procedure, which revealed inflammatory changes consistent with mucosal prolapse. Dr. Curtis, therefore, entered an order for inmate Prentice to provide a stool sample to the medical staff, who would then notify the camp physician of the physical appearance of the sample. On July 27, 2018, Dr. Curtis reviewed a nurse's note that inmate Prentice provided a stool sample as ordered, and the nurse noted that his sample was non-formed, brown, soft, loose stool without a watery diarrhea consistency. Curtis Aff. ¶ 32.

On August 2, 2018, Dr. Curtis conducted a review of inmate Prentice's chart and entered the following orders: 1) chew and swallow one acidophilus/bulgaricus tablet (digestive aid) three times a day under direct observation for 70 days; 2) take one 3000 U tablet of Lactase (lactose digestive aid) four times a day, one hour before meals and before bedtime, for 70 days; and 3) and fasting lab work, which included a comprehensive metabolic panel (CMP), Free T-4, Free T-3, and CBC with differential, to be completed by October 16, 2018. Upon information and belief, Dr. Curtis noted that his July 25, 2018 order for and request for the submission of a UR Request for inmate Prentice to undergo an EGD and colonoscopy had not yet been submitted, and, therefore, Dr. Curtis reentered the order. Dr. Curtis also instructed nursing to inform inmate Prentice that the EGD and colonoscopy had been ordered due to lab work indicating the passage

of blood in his stool. Curtis Aff. ¶ 32.

On August 13, 2018, a nurse noted in inmate Prentice's chart that the EGD and colonoscopy had been scheduled for September 25, 2018 at Central Prison. In preparation for the procedure, the nurse entered an order for inmate Prentice to start drinking 8 ounces of Golytely every fifteen minutes until he had consumed a total of 4000 ml. The nurse further instructed that inmate Prentice was not to consume solid food after midnight the day before the procedure. Later the same day, Dr. Curtis reviewed the nurse's order and added to the order that seven days before the procedure, inmate Prentice was to discontinue taking all NSAIDS and that he was to be referred to a camp provider if he was taking any blood thinning or anti-coagulation medication (he was not). Curtis Aff. ¶ 32.

On September 25, 2018, inmate Prentice was transported to Central Prison to undergo an EGD and colonoscopy. Shehzad Sheikh, M.D. ("Dr. Sheikh"), the provider performing the procedures, first performed the EGD which was normal. Dr. Sheikh proceeded with the colonoscopy, which revealed small internal hemorrhoids. Dr. Sheikh obtained a biopsy to rule out microscopic colitis. On September 28, 2018, the results of the colon biopsy were reported which indicated that the specimen showed no evidence of active or any specific colitis. It was also negative for dysplasia. Curtis Aff. ¶ 32.

Upon information and belief, on or around October 9, 2018, Dr. Curtis was notified about two Sick Call Appointment Requests in which inmate Prentice requested evaluation of his diet, renewal of expired medications, and in which he complained of continued bloody diarrhea, fatigue, and abdominal pain. Dr. Curtis ordered a standard, gluten-free diet per the dietary recommendations made on September 10, 2018. Dr. Curtis verbally instructed the nurse to submit a UR Request for inmate Prentice to receive approval for a gluten-free diet, as it was noted in

August 2017 lab work that inmate Prentice might have Celiac disease (gluten-sensitive enteropathy. On October 18, 2018, Dr. Curtis reviewed the nurse's referral for orders to renew expired medications. During his review of inmate Prentice's chart as to this issue, Dr. Curtis noted that inmate Prentice had a pending appointment with a physician extender for an examination and to address complaints of diarrhea and bloody stool. Dr. Curtis decided that it would be appropriate to wait until the findings of that examination and, therefore, did not enter any orders at that time. Curtis Aff. ¶ 32.

On October 22, 2018, Dr. Curtis personally examined inmate Prentice. Inmate Prentice advised Dr. Curtis that he had diarrhea throughout the day, most frequently between 5:00 a.m. and 7:00 a.m. He did not have any nocturnal diarrhea events. Inmate Prentice stated that he had been prescribed Imodium in the past. Dr. Curtis also reviewed the EGD/coloscopy report, considered the recommendations, and determined that because inmate Prentice was not having difficulty defecating, anorectal manometry was not medically necessary at that time. Dr. Curtis was already treating inmate Prentice for irritable bowel syndrome. Inmate Prentice described his stool as usually brown, that the bright red blood changed the color of his stool and water, but also stated that the blood mainly appeared on toilet paper. Inmate Prentice denied having any unusual interpersonal issues with other inmates but admitted that other inmates would try to get him to vacate the bathroom stall he was using to defecate so that the other inmates could use it to masturbate. Dr. Curtis was concerned that inmate Prentice might be being targeted by others, noting that forced anal sex could cause rectal tears which could cause his rectal bleeding, and which could have been healed at the time of his last colonoscopy. The lack of physical findings and the fact that inmate Prentice's bouts of diarrhea did not occur nocturnally suggested that his symptoms might be psychological and not pathological. As a result, Dr. Curtis referred inmate

Prentice for a mental health encounter with a psychologist to help him develop means to cope with prison life and to investigate whether he was being targeted by other inmates. Dr. Curtis noted that the lab work that he ordered on August 2, 2018 had not been completed and, therefore, Dr. Curtis entered an order for those labs to be drawn as soon as possible indicating that they were to have been completed by October 16, 2018. Dr. Curtis also entered additional orders for a stool culture, fecal fat, fecal leukocytes, ova and parasite tests. Curtis Aff. ¶ 32.

On December 5, 2018, Dr. Curtis conducted a review of inmate Prentice's chart and entered orders renewing the following medications: 1) take 25 mg of Amitriptyline at bedtime under direct supervision for 90 days; 2) take one 20 mg tablet of Atorvastatin at bedtime for 90 days; 3) take one Lactase 3000 U tablet four times a day for 90 days; and 4) take one 200 mg tablet of Sulindac twice a day for 90 days. Dr. Curtis also pended a note to nursing indicating that inmate Prentice's orders for extra blankets and thermals was valid through 2019 and that he needed to be evaluated before an additional pillow could be issued. Curtis Aff. ¶ 32.

Although a nurse noted inmate Prentice's chart would be referred to Dr. Curtis for review on February 2, 2019, his chart was not forwarded to Dr. Curtis until after inmate Prentice's transfer to Tabor Correctional Institution. Curtis Aff. ¶ 32.

At no time did Dr. Curtis disregard the symptoms with which inmate Prentice presented, but to the contrary, Dr. Curtis took appropriate action and made professional decisions and treatment plans based on inmate Prentice's complaints, Dr. Curtis's assessments, Dr. Curtis's medical judgment, and/or the objective findings of the other health care providers who examined him. None of Dr. Curtis's actions or decisions was taken for the purpose of causing harm to inmate Prentice. Dr. Curtis did not ignore inmate Prentice's medical needs or deny him any necessary treatment for any alleged medical condition. Dr. Curtis has denied and continue to deny

these allegations and denies that he was deliberately indifferent to any of inmate Prentice's alleged medical needs. Curtis Aff. ¶ 32.

## III. DR. CURTIS IS ENTITLED TO QUALIFIED IMMUNITY

"Qualified immunity shields government officials from civil damages liability unless the official violated a statutory or constitutional right that was clearly established at the time of the challenged conduct." *Taylor v. Barkes*, 575 U.S. 822, 825, 135 S. Ct. 2042, 2044 (2015) (quoting *Riechle v. Howards*, 566 U.S. 658, ___, 132 S. Ct. 2088, 2093 (2012)).[1] "To be clearly established, a right must be sufficiently clear that every reasonable official would have understood that what he is doing violates the law." *Id*. Qualified immunity "protects all but the plainly incompetent or those who knowingly violate a law." *Ashcroft v. al-Kidd*, 563 U.S. 731, 743 (2011) (int. quot. omitted). "We do not require a case directly on point, but existing precedent must have placed the statutory or constitutional question beyond debate." *Taylor,* 135 S. Ct. at 2044 (quoting *al-Kidd*, 563 U.S. at 741). Where the purported right was not "clearly established" at the time of the challenged conduct, district courts are authorized to resolve the issue of qualified immunity in the official's favor on this ground alone, without reaching whether the underlying constitutional claim is viable. *Pearson v. Callahan*, 555 U.S. 223, 236 (2009).

When evaluating a public official's entitlement to qualified immunity, "the court ordinarily assesses whether the plaintiff's complaint states sufficient factual allegations that, if true, show a violation of clearly established constitutional rights. To do so, the plaintiff's complaint must allege conduct a reasonable [person] would know to be unlawful." *Cloaninger v. McDevitt*, 555 F.3d 324, 331 (4th Cir. 2009). Qualified immunity applies unless the official violated such a right.

---

[1] If a medical provider is a state actor, and thus subject to potential liability under 42 U.S.C. § 1983, that medical provider is entitled to assert qualified immunity. *See Davis v. Greene*, No. 2:08-1143, 2009 WL 3064106, at *13 (S.D.W.Va. Sept. 18, 2009).

14

*Anderson v. Creighton*, 483 U.S. 635, 640, 107 S. Ct. 3034, 3039 (1987). Qualified immunity is "an *immunity from suit* rather than a mere defense to liability...[therefore] it is effectively lost if a case is erroneously permitted to go to trial." *Mitchell v. Forsyth*, 472 U.S. 511, 526, 105 S. Ct. 2806, 2185 (1985) (emphasis in original).

The evidence in this case supports the fact that no constitutional right was violated and the reasonableness of Dr. Curtis's conduct. As set forth in detail above, Dr. Curtis responded to Plaintiff's complaints when Plaintiff and/or Plaintiff's chart were referred and provided to him. Dr. Curtis provided appropriate treatment and referrals and submitted UR Requests for approval when they were necessary. *See generally* Curtis Aff. Dr. Curtis used his medical judgment to provide appropriate treatment for the complaints with which Plaintiff presented. *Id.* As such, Dr. Curtis had no reason to know and/or realize that his conduct could constitute a violation of Plaintiff's constitutional rights. Thus, Dr. Curtis is entitled to qualified immunity.

## **CONCLUSION**

Based on the foregoing, Defendant Curtis respectfully requests that the Court dismiss Plaintiff's claims pertaining to him, enter judgment in his favor, and grant such other relief the Court deems proper and just as: (1) Defendant Curtis was not deliberately indifferent to Plaintiff's serious medical need, if any, and (2) Defendant Curtis is entitled to qualified immunity.

Respectfully submitted,

This the 7th day of July, 2022.

                                      WALKER, ALLEN, GRICE, AMMONS,
                                      FOY, KLICK & MCCULLOUGH, L.L.P.

                                      /s/ Elizabeth P. McCullough
                                      Elizabeth P. McCullough
                                      N.C. State Bar # 32301
                                      *Attorneys for Defendant Clifford Curtis, M.D.*
                                      222 N. Person Street, Suite 205
                                      Raleigh, NC 27601
                                      Telephone: (919) 594-6760
                                      Email: elizabeth@walkerallenlaw.com

# CERTIFICATE OF SERVICE

I hereby certify that on the 7th day of July, 2022, I electronically filed the forgoing document with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to the following CM/ECF participants:

Bettina J. Roberts
North Carolina Department of Justice
114 W. Edenton Street
Raleigh, North Carolina 27602
bjroberts@ncdoj.gov
*Attorney for Defendant Hooks, Agarwal, and Lewis*

John D. Kocher
Christopher T. Hood
Shumaker, Loop & Kendrick
101 S. Tryon Street, Suite 2200
Charlotte, North Carolina 28280
jkocher@shumaker.com
chood@shumaker.com
*Attorney for Defendant Haynes*

Stephen Kyle Pytlik
Jeffery D. Keister
McAngus Goudelock & Courie, PLLC
Post Office Box 30516
Raleigh, North Carolina 27622
stephen.pytlik@mgclaw.com
jkeister@mgclaw.com
*Attorneys for Defendant Tolman*

Jennifer D. Maldonado
Suzanne R. Walker
Yates, McLamb & Weyher, L.L.P.
Post Office Box 2889
Raleigh, North Carolina 27602
jmaldonado@ymwlaw.com
swalker@ymwlaw.com
*Attorneys for Defendant Agarwal*

Jonathan Hall
Stacy Little
Parker, Poe, Adams & Bernstein, LLP
Post Office Box 389
Raleigh, North Carolina 27602
jonathanhall@parkerpoe.com
stacylittle@parkerpoe.com
*Attorneys for Defendant Lewis*

I hereby certify that on the 7th day of July, 2022, I electronically filed the forgoing document with the Clerk of the Court using the CM/ECF system and I mailed said document to the following non-CM/ECF participant:

Steven Dixon Prentice, *pro se*
#1502120
Pender Correctional Institution
Post Office Box 1058
Burgaw, North Carolina 28425

WALKER, ALLEN, GRICE, AMMONS,
FOY, KLICK & MCCULLOUGH, L.L.P.


By: /s/ Elizabeth P. McCullough
Elizabeth P. McCullough
N.C. State Bar # 32301
*Attorney for Defendant Clifford Curtis, M.D.*
222 N. Person Street, Suite 205
Raleigh, NC 27601
Telephone: (919) 594-6760
Email: elizabeth@walkerallenlaw.com