UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NORTH CAROLINA

FILED
AUG 26 2022
PETER A. MOORE, JR., CLERK
US DISTRICT COURT, EDNC
BY_____ DEP CLK

| STEVEN DIXON PRENTICE, | NO. 5:20-CT-3150-D |
|---|---|
| PLAINTIFF, | |
| vs. | PLAINTIFF'S MOTION IN OPPOSITION |
| EDDIE M. BUFFALOE, JR, | TO DEFENDANT'S MOTION FOR |
| DEFENDANT. | SUMMARY JUDGMENT |

COMES, Steven Dixon Prentice, Plaintiff, to make response to the Defendant's Motion for Summary Judgment, where Defendant Eddie Buffaloe, Jr. alleges:

1) the Defendant did not violate any Eighth Amendment or Constitutional or Statutory Rights;

2) the Defendant and State has Sovereign Immunity protections; (11th Amendment);

3) the Plaintiff is not entitled to any damages;

4) the §1983 should be dismissed because Plaintiff "failed to satisfy the requirement of a valid ADA claim;

5) the Court dismissed allegations of discrimination of ADA, but allowed Reasonable Accommodation claim to proceed; and

6) the Plaintiff misclassified his medical claims as ADA/RA accommodations which prison officials correctly directed Plaintiff to sick call policy or custody policy to obtain the "accommodation" he was requesting.

Defendant requested dismissal based on the above allegations. Plaintiff contends that the Defendant is wrong, the claims are misleading and/or false, and the matter must proceed based on the following:

(i)   (PMOB)

# DEFENDANTS' MISHANDLING OF ADA CLAIMS FOR REASONABLE ACCOMMODATIONS

## I. VIOLATES FEDERAL AND STATE REGULATIONS

At the beginning of Defendant's Summary Judgment Motion, he contends that the Plaintiff has failed to satisfy requirements of a valid ADA claim. A review of records reveals how incorrect that contention is and how Defendant Buffaloe would conceivably make such a mistaken assumption (the Defendants call it a "conclusory statement").

### A.) DEFENDANT BUFFALOE IS REMISS IN HIS DUTIES AS DIRECTOR

According to Defendant's response to Interrogatories his attorney has presented to this Court, Director Buffaloe lists the following personal and professional training as part of his official duties:

1.) <u>Prison Rape Elimination Act (PREA)</u> - 3.0 Hours, on 06-14-18, 12-09-19, 11-18-20, 11-20-21;

2.) <u>NCDPS Human Resources, NCVIP Introduction for Supervisors</u> - 9 Hours, 25 minutes on 04-05-22;

\* 3.) <u>Medical Training</u> - 0 Hours; \*

\* 4.) <u>ADA Training</u> - 0 Hours; \*

5.) <u>Information Technology & Cyber Security</u> - 10 Hours, 18 minutes;

6.) <u>Religious Accommodations</u> - 0 Hours. (see, Record, Interrogatories (Buffaloe)).

So, Defendant Buffaloe, admittedly, has <u>NO</u> training in ADA or the policies as they apply. Yet, Defendant as Director approves, creates, and signs policies. The <u>Americans with Disabilities Act (ADA), Reasonable Accommodations for Inmates with Disabilities</u> policy at <u>Chapter E, Section 2600</u> states:

(1)　　　　　　　　　　　　　　　　　　(PMOB)

Section 2601 - Authority - "This policy is issued by the Director of Prisons who is given the authority to manage and direct the total operations of prisons, and to establish such rules and regulations as prescribed."

The purpose of this policy is to show compliance with the ADA. (See Appx "B").

At Section 2607, Subsection (J), it states:

"1.) ADA training will be provided to all current Department of Public Safety prisons staff on policy and procedures regarding the ADA process for Inmates. New employees will be provided ADA training as part of new employee orientation.

2.) All Department of Public Safety Prison staff are mandated to annually attend ADA for Inmates training.

3.) All Department of Public Safety Prisons Staff will be trained through use of audio and visual methods and will be provided printed educational information on the ADA policy and procedures regarding the Americans with Disabilities Act and Inmates." (See, Appx "B").

So, Defendant was presented with the ADA information and is signing the policies for ADA, he just is not reading them in order to make educated decisions and properly "manage and direct the total operations of prisons."

Plaintiff would contend that he is being deprived of his rights, due to the uneducation of the defendant and those he "supervises," who are failing to adhere to the laws and Constitution(s). The Defendants do not have discretionary power to ignore their own regulations.

Defendant says he has been employed in NCDPS since 1993, which is about 29 years to familiarize himself with the ADA in the annual training.

(2) (pmoB)

B.) **DEFENDANTS MISHANDLED ADA REQUESTS, SUPPORTED BY THIS DEFENDANT AND ADMINISTRATION CAUSING VIOLATIONS**

This Plaintiff has articulated his needs to all of the defendants, in their respective positions, and in every way possible. And, unfortunately, Plaintiff has been passed off from one to another, over and over, in what Plaintiff described as an endless "merry-go-round", jumping through every hoop demanded by the defendants.

The defendants claimed that there were only two Requests made for Reasonable Accommodations under the ADA. Instead, Plaintiff made requests as:

1) 06-07-16   Requesting Replacement of Headphones to use with Hearing Aids. Staff determined Plaintiff "not to be qualified, not a disabled person." (see, Discovery Record, pages, DOC 186-1, 08-05-22);

2) 05-24-19   Requesting Reassignment to "Blue C-Pod" as housing that would meet 3 of 4 physical disability needs involving Hearing disabilities, musculoskeletal damage, and digestive issues, listed as physical impairments at Title II 2.2000 and major life activities at Title II 2.4000, by providing quieter housing, a bottom bunk and individual toilet.
   Staff verified the "Health Conditions" but denied Requests to suggest Plaintiff follow-up with medical and custody departments. (See Doc 186-2);

3.) 08-07-20   Requesting Replacement of Digital Radio, that staff "lost", to use with Hearing Aids. Staff determined "Essential Eligibility for the Program, Service, or Activity" as "Qualified," but evaluated Plaintiff as an "Unqualified Person with a Disability." (See Discovery,

(3)                                              (PMOB)

, pages 606 to 609); The reviewer denied the request and advised Plaintiff to go to canteen to purchase a Radio and medical for new Hearing Aids (see Discovery, pages 544-46);

4) 04-16-22 Requesting the digital Radio and Headphones. Though initially recommended for denial, ADA Coordinator (Feaster) modified the decision to permit Plaintiff to purchase the device(s) or if he cannot, the facility would order.

NOTE: After pushing back and forth between canteen and medical, the Superintendent (Timothy Jones) and Assistant Superintendent (Demetrius Trahan) approved orders. On August 09, 2022, the Plaintiff received a set of "Oneodio" Headphones and is still searching for a Radio that meets DPS protocols.

After the suit was filed and Plaintiff lost consciousness (related to the spinal damage in his neck) causing a fall and more damage, the Neurologist placed Restrictions on Plaintiff, including:
- Bottom Bunk
- Lifting limited to 25 pounds
- Pushing or Pulling limited to 25 pounds
- No Stooping
- No Mopping or Sweeping
- No Twisting

The Neurologist said in his review of the last MRI on March 04, 2021, that the "Results are Severe!" "Patient needs to be referred to Neurosurgeon ASAP." (See Discovery, 498 Form (medical Duty Status) page 110 of 1445; Fax from Neurologist, Indra S. Gatiwala, M.D. page 133 of 1445; UR Review Summary, 03/09/21, page 35 of 1445).

For more than a year, these restrictions have kept Plaintiff from obtaining a prison job and certain classes. Under the NCDPS ADA policy, Defendants could permit the Plaintiff to become employed as long as his job did not require him to violate the above-

(4) (mod)

physical Restrictions as a Reasonable Accommodation for instance, in a Teaching Assistant position which he is currently waiting for.

The <u>ADA Title II and NCDPS policy at Chapter E, Section 2604 (Definitions)</u>, match each other to describe "<u>Disability</u>" as:

"(1) A physical or mental impairment that substantially limits one or more of an individual's major life activities; or

(2) A record of such an impairment; and/or

(3) Perceived or regarded as having such impairment."

(b) The "<u>Major Life Activities</u>" includes, as related to this case:
"- performing manual tasks, walking, hearing, sleeping, lifting, bending, communicating, working, the operation of a major bodily function, including but not limited to, digestive, bowel, bladder, neurological functions."

"(c) <u>Substantial Limitation of a Major Life Activity</u> - A condition that renders an individual unable to perform a major life activity that the average person in the general population can perform, and the determination of which requires an individualized assessment."

"(d) <u>Physical or Mental Impairments</u> - include:
(i) Any physiological disorder or condition, or... anatomical loss affecting one or more of the following body systems: neurological; musculoskeletal; special sense organs; digestive; hearing impairments."

All three of the medical complaints made by Plaintiff fit these definitions including: <u>Hearing Losses</u> requiring Hearing Aids and Auxiliary Devices, <u>IBS-D</u> requiring medications, extra toilet tissue and durable devices, and <u>Spinal/neurological damages</u>

(5)   (pmod)

that resulted in Plaintiff's additional injuries and the imposed physical limitations and restrictions. Thus, this was both a medical issue and ADA issue, which required custody departments to provide accommodations, as long as they did not "pose a risk to the safety and security of the prison facility, staff, or the public, or when the request would adversely impact other penological interests, e.g. deterrence of crime, interference with rehabilitative efforts, and maintenance of inmate discipline." (See, NCDPS policy, Chapter E, Section 2607, Procedures, Subsection (d)(1)).

This same policy would require the defendants to determine Plaintiff to be "disabled" in accordance with Title II definitions, or in the extreme "medically unfit." Plaintiff contends, he could be "disabled" and still be employed through accommodation since there are five other Teaching Assistants who can perform the restricted activities, without being "medically unfit." Defendants simply refuse to recognize any disabling conditions other than total paralysis, which in itself is discriminatory and violates Equal Protection as Constitutional Rights. Defendants previous refusal to treat the conditions with standard measures violated the Eighth Amendment. Further, the prohibition on permitting Plaintiff to work in jobs, while also refusing to give "good time" as "medically unfit" violates the Fourteenth Amendment's liberty protections because it forces Plaintiff to serve more time on his sentence that what is required of similarly situated prisoners.

When Plaintiff wrote letters to this Defendant complaining of these issues, and filed Administrative Remedy Requests, Defendant was required to have the matter reviewed and a Risk Assessment made for liability to the Agency/State. (See, NCDPS policy Chapter A). But, as presented above, Defendant Buffaloe has not acknowledged ADA training and cannot side-step or ignore his duties, or permit others to do so.

(6)

(PmoB)

Prior to the ADA Request on 05-24-2019, Plaintiff already had validation of the three conditions in Defendants' records. Medical had provided devices, and some necessary medications and custody had provided the extra bed mat, pillow, thermal underwear, and toilet tissue and the ADA requests were all made in accordance to NCDPS policy and per NCDPS staff instructions. So, Defendant Buffaloe's twist on the situation, though artistic, is simply incorrect... Staff were not "being helpful", they were being obstinate; Plaintiff meets the definition of "Disabled". Even if the Defendants could get away with refusing to accept the neurological and digestive conditions as disabilities, they cannot by any stretch of the imagination ignore the fact that Plaintiff (with ample evidence from separate sources) is 100% deaf in one ear and has substantial hearing loss in the other ear, with devices to assist Plaintiff in his participation in prison programs, activities or services, which undisputedly qualifies as a disability.

    The Custody departments require the medical department to direct them to provide accommodations... and medical requires a prisoner or staff to submit a NCDPS form DC-746 requesting such actions, all of which Plaintiff did on multiple occasions, all failing until the §1983. Now, all Plaintiff can request is an injunction requiring the State to provide accommodations in the future during Plaintiff's remaining incarceration and whatever damages a judge or jury deems fit in punitive and/or compensatory, and assurance of continuity of medical care for these needs, as a "Qualified Individual" under Title II, 2.8000, 28 CFR 35.104.

    The defendant's assertion that "Plaintiff cannot show a violation of ADA/RA" is incorrect and Plaintiff has met his burden. This matter should proceed and Motion for Summary Judgment should be denied.

(7)

## II. DEFENDANT IS NOT ENTITLED TO ELEVENTH AMENDMENT PROTECTIONS

Defendant Buffaloe argues that he and his office, are protected against suits by the Eleventh Amendment to the Constitution, that the State has not waived its immunity, and thus the suit against this Defendant should be dismissed. Plaintiff contends that such protection is inapplicable here.

While in the context of most civil suits, the defendant would be correct, the defendant is (Plaintiff contends), wholly incorrect when the suit is in relation to violations of the Americans with Disabilities Act and/or Rehabilitation Act, because (1) the State has waived its Eleventh Amendment rights for these situations; and (2) it is clear that Congress has abrogated the States' Eleventh Amendment protections for declaratory and injunctive relief under Title II of the ADA. (See, United States v. Georgia, 546 US 151, 160, 126 SCt. 877 (2006) (concurring opinion); McCarthy v. Hawkins, 381 F3d 407, 413 (5th Cir. 2004).

It is true that it is not yet clear whether states or official capacity defendants can be held liable for damages for prison ADA violations that do not <u>also</u> violate the Constitution. But, here Plaintiff has alleged that his complaints actually <u>do</u> violate both the ADA and constitutional Amendments. See, Tennessee v. Lane, 541 US 509-21, 124 SCt 1978 (2004) (discussing how far the statute can go in imposing damage liability on states, and still be "congruent and proportional;" (see also, Goonewardana v. New York, 475 F.Supp 2d 310, 322-27 (S.D.N.Y. 2007) for useful discussion on "congruent and proportional" test).

In the U.S. v. Georgia, id. case, at 155-60 specifically referred to Fourteenth Amendment Rights. Factually, virtually all constitutional claims by state prisoners are Fourteenth Amendment claims in part, because the Fourteenth Amendment

(8) (PMOA)

"incorporates" the Eighth Amendment's protection against cruel and unusual punishments and makes it applicable to the States, Georgia, 546 US at 157 (citation omitted). In Georgia, the Court said that its holding should be extended generally to claims about the mistreatment of disabled prisoners. If the Court bases its damages award on the "congruence and proportionality" of the problem of the State of North Carolina's violations of Rights of Disabled prisoners, here where the State's jailed population of disabled prisoners makes up approximately 10 to 20 percent of its 36,000 prisoners, or about at least 3,600 or up to 7,000 inmates, suffering without medical and/or ADA assistance on a daily basis, even though North Carolina receives an estimated $100 million U.S. Dollars in funding, specifically for those needs; this is similar to the $1.2 million U.S. Dollars Pender Correction (where Plaintiff is housed) mandated to install Air conditioning in five inmate dorms with pre-existing duct systems. All officials had to do in the last three years was install the A/C units on the roof and blow out the Air ducts. But, like the ADA funding, the money just vanishes without any accountability or oversight... And still no A/C.

    Plaintiff has alleged violations of the Eighth Amendment and ADA/RA which here are entertwined because of how NCDPS handles medical care and ADA requests for Reasonable Accommodations. The Supreme Court has rejected the argument for immunity in cases like this case, which this Court announced during its initial frivolity review. (See Record; also Hafer v. Melo, 502 U.S. 21, 27-28, 112 S.Ct. 358 (1991).

The Law -

    Title II of the ADA, codified as 28 CFR, Part 35.178 [State Immunity], states as follows:

(9)         (PmoB)

"A State shall not be immune under the Eleventh Amendment to the Constitution of the United States from an action in Federal or State Court of competent jurisdiction for a violation of this Act. In any action against a State for a violation of the requirements of this Act, remedies (including remedies both at law and in equity) are available for such a violation to the same extent as such remedies are available for such a violation in an action against any public or private entity other than a State."

See, 28 CFR, Part 35.178 (Title II of ADA).

The language and intent of Part 35.178 is without exclusion or exception and State of North Carolina is no different, in this respect, than any other State. There is no immunity protection in this case for defendants.

Equal Application -

A common sense approach, combined with an understanding of how the prison system is set up, reveals why, even if the defendant did not bother to learn the policy(ies) he signs, he should know a violation occurs if he permits exclusion of disabled inmates from programs, activities or services or interferes with access.

All of North Carolina's prison facilities utilize radio-based access to all of its programming services, especially via television. This configuration requires inmates to possess a FM Radio and Headphones because the televisions do not use external speakers. The state make three types of devices available: (1) Analog AM/FM Radios (for purchase at canteen); (2) Digital AM/FM Radios (by special purchase); and (3) Computer Tablets (which were approved by the State

(10) (pmob)

several years ago, but most facilities do not yet have tablets. Women's facilities, gang units and maximum level facilities do have them; But, very few medium and minimum custody facilities have tablets. If you are a trouble-maker, commit assaults and have a violent record, you have a tablet. (This Plaintiff does not have a tablet).

Tablets also have "Bluetooth" capabilities and female prisoners were issued Hearing Aids with bluetooth connectivity directly to tablets. Officer and staff have Bluetooth Hearing Aids. As far as this Plaintiff has determined through research, male inmates do not yet have Bluetooth Hearing Aids and the subject does not have an official policy to address the issue. (See Record, NCDPS policy, Durable Medical Equipment).

<u>Disability Affects</u> -

Like this Plaintiff, hearing loss and hard of hearing prisoners can (most times) do very well in small offices with little to no background noise. Add in noises, echoes, fans, machinery, etc and you have situations where, if you can hear at all, the majority of times you will hear the fact that someone is speaking, but are unable to understand what is being said. It also depends on the volume and tones of the speaker (loud/soft and high pitch/low pitch). This Plaintiff has a very deep voice that people without hearing difficulties have trouble understanding. Further, it is human nature to speak louder and enunciate words when you know you are speaking with hearing disabled persons. For some reason, the defendants do not seem to be aware of any of these facts and criticize Plaintiff for something for which he has no control: his ability to hear in a small, quiet setting vs. his inability to hear in noise chaotic areas.

It is difficult to tune an analog radio precisely on a station. And, because

(11)                                                                                       (AmoB)

of the way the analog tuner and rubber dial strip is made, most radios will "drift" off of the station, requiring the user to readjust the tuner repeatedly. This problem is eliminated by digital radios, which pinpoint stations with a button. Plaintiff, in his last ADA accommodation request was approved to purchase a Digital Radio or he was told the facility could order a radio. After five months, Plaintiff does not have a radio and staff at Pender block his receipt of any pictures and data for radios, so, Plaintiff is unable to (1) get information and prices to choose a model; and (2) Plaintiff cannot show the Superintendent what he chose for approval to lessen problems, rejections, etc. Staff seem to go out of their way to make everything difficult. A model of Radio, or style, or color thats not approved arrives, it is going to be rejected or staff will destroy it, unnecessarily costing money, and time, and patience [s.p.] for family members. It is very "hit and miss" because this Defendant as the creator of policy, has not made a policy for the provision and ordering of Radios, devices, etc. It is different process at every facility.

    <u>Title II 7.1000</u> provides that, "Audio portions of television and videotape programming produced by public entities are subject to the requirement to provide equally effective communications for individuals with hearing impairments." "In order to provide equal access, a public accommodation is required to make available appropriate auxiliary aids and services where necessary to ensure effective communication." (Note: I think they meant "public entity" not "public accommodation"). See, <u>28 CFR 35.160 to 35.164.</u>

    "It is important to consult with the individual to determine the most appropriate auxiliary aid or service, because the individual with a disability is most familiar with his or her disability and is in the best position to determine what

(12)    (PMOB)

type of aid or service will be effective." See, Title II -7.1100, Primary Consideration.

This defendant has not familiarized himself with the ADA requirements so that he may update the NCDPS policies to avoid the problems Plaintiff has experienced and foster creation of standard processes and protections/enforcement of ADA. The current policy is bad because it limits an inmate's ability to replace/order only one hearing aid every two years, even if, as occurred here, the device dies without notice, leaving the inmate stranded with his disability. See, Discovery; Defendant Clifford Curtis Exhibits, NCDPS Standard Operating Procedures (SOP) for Tabor City, (pages 35 to 40); NCDPS policy TX VII-3 (pages 41 to 51); SOP for Central Prison (pages 52 to 105); SOP for Pamlico (pages 106 to 131); SOP for Pender (pages 132 to 154); SOP for Warren (pages 155 to 185 and 1660 to 1670).

Title II -3.4100, (Separate programs) provides, "A public entity may offer separate or special programs when necessary to provide individuals with disabilities an equal opportunity to benefit from the programs." Title II -3.4300 states, "Even if a separate or special program for individuals with disabilities is offered, a public entity cannot deny a qualified individual with a disability participation in its regular program. Qualified individuals with disabilities are entitled to participate in regular programs, even if the public entity could reasonably believe that they cannot benefit from the regular program." This follows the Equal Protection provided by the Constitution.

Plaintiff contends that it is impossible to supervise a task you do not understand. And, if this defendant does not take the time to understand the ADA and needs of prisoners with disabilities, Defendant Buffaloe also cannot adequately ensure the ADA and policy is properly enforced and he has failed in his duty.

(13)   (ProB)

If the Defendant received and read Plaintiff's letters and chose to ignore them (or his office/predecessor did so) then there has been a deliberate violation of Plaintiff's rights, which Defendant Buffaloe has an obligation to remedy, with or without a Court Order. Plaintiff acknowledges the fact that the complaint and its issues predate this Defendant. But, as his counsel points out in motions, the office and agency would be responsible for liability. It is likely, for that reason, that the Court placed the Director in his official capacity. However, it is also the uncaring attitude that has failed to correct the problems at the facility levels, resulting in the <u>Eighth</u> and <u>Fourteenth Amendment</u> violations going unchecked.

All of Plaintiff's conditions qualify as disabilities and Plaintiff is a qualified individual, who while serving a significant portion of his sentence, remains out of trouble, has no institutional violence, no gang affiliations, goes to classes for programming and attempts to work, even with physical limitations (which Defendants could recognize while providing approval to work as a Teaching Assistant), Plaintiff would be subject to disciplinary action, if he violated the limitations/restrictions, but still able to earn "good time" credits on his sentence.

<u>NCDPS policy Chapter E, Section 2607 (9) (Inmate Programs)</u> provides:

"(1) No inmate shall be discriminated against in participation in a job, program, activity or service based on his/her disability. Prison is required to make reasonable accommodations to known inmates with qualifying disabilities.

(2) Prison will modify jobs, programs, activities or services to the extent that a qualified disabled inmate can participate unless doing so would pose undue hardships for Prisons or pose a threat to security."

(14)   (PmoB)

## III. DEFENDANT AND/OR HIS OFFICE HAS LIABILITY

Plaintiff contends that defendant and/or his office has liability in this matter where even after his office received notice from Plaintiff of violations, the office took no action to correct violations, permitting a pattern or custom at the lower facilities. Supervisors are liable for medical care deprivations if they fail to take steps to provide an adequate medical care system. Miller v. King, 384 F3d 1248, 1263 (11th cir. 2004) (prison supervisor could be liable for failing to act on knowledge that prison staff are unlawfully delaying or denying medical care).

Plaintiff would also contend that the same should apply or extend to the ADA claim because NCDPS utilizes policies that make the ADA and medical care policies interdependent on each other.

There are various ways personal involvement can be shown. The Courts in Ruiz Rivera v. Riley, 209 F3d 24, 28 (1st cir. 2000) and Cronn v. Buffington, 150 F3d 538, 544 (5th cir. 1998) has said that a §1983 defendant can be held liable if:

(1) the defendant participated directly in the alleged constitutional violation, (2) the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong, (3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such policy or custom, (4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts, or (5) the defendant exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that unconstitutional acts were occurring. (See also, Colon v. Coughlin, 58 F3d 865, 873 (2nd cir. 1995)).

(15)   (PmoB)

Here, this Defendant is liable under all of the criteria listed above except for number one, in that Defendant Buffaloe did not directly participate in violations. But, in the nearly three decades the Defendant has been employed at NCDPS he (somehow) did not participate in the mandatory annual ADA training and has not enforced the policy upon his subordinates, providing them with impunity to violate rights. And, yet he signs and approves these policies, in a custom created by his predecessor.

For the reasons presented by this Plaintiff, he humbly asks the Court to deny the Motion for Summary Judgment.

Respectfully presented this 16 Day of August, in the Year of Two Thousand and Twenty-Two.

Steven D. Prentice
Plaintiff
Opus # 1502120
P.O. Box 1058
Burgaw, NC 28425

(16) (PMSJ)

CERTIFICATE OF SERVICE

This is to certify that in accordance with the U.S. District Court's Standing Order for prisoner's submission of a single copy to the Clerk for ECF and distribution, Affiant has mailed the response to the Motion for Summary Judgment and Affidavit to the Clerk by First-Class mail, postage affixed. (see Standing Order 18-SO-5).

DATED: 08-16-2022

Steven Prentice, Affiant